IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| TRACY LYNN FULTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:09-cv-2015-JPM-tmp |
| | ) |
| WEST COAST LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, TO REMAND TO STATE COURT**

Before the Court is Plaintiff Tracy Lynn Fulton's
("Plaintiff") Motion for Partial Summary Judgment or, in the
Alternative, to Remand to State Court (Docket Entry ("D.E.")
47), filed March 15, 2010.  Defendant West Coast Life Insurance
Company ("West Coast Life") responded in opposition on April 14,
2010.  (D.E. 49.)  For the following reasons, Plaintiff's motion
is DENIED in full.

**I.   Background**

This case arises from Plaintiff's claim for life insurance
benefits following the death of her husband, David Fulton.  On
April 14, 2009 the Court granted Plaintiff's Motion for Leave to
Amend Complaint and Join Additional Party Defendants.  (D.E.

1

22.)  The joinder of additional parties divested the Court of
diversity jurisdiction, and the case was remanded to the Circuit
Court of Tennessee for the Thirtieth Judicial District.  (Id.)

On December 16, 2009 Defendant filed a Notice of Removal
pursuant to 28 U.S.C. § 1331, claiming that Plaintiff's claims
arise under a policy that was applied for as part of an
"employee welfare benefit plan" governed by the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §
1001 et seq.  (D.E. 25.)  The Court held a telephonic status
conference on February 2, 2010 at which time Defendant was
ordered to file the administrative record by February 12, 2010.
(D.E. 37.)  On March 15, 2010 Plaintiff filed the instant motion
requesting partial summary judgment or, in the alternative,
remand to state court.

In 1999, David Fulton ("Fulton"), Plaintiff's deceased
husband, was hired by Power Express, Inc. ("Power Express") and
by a related company, TCI Logistics, to oversee third-party
warehousing for Power Express and to serve as a safety manager
for TCI Logistics.  (Jeffrey Konrad Dep. (D.E. 49-3), Ex. 1 at
16:1-18:24.)  According to Jeffrey Konrad, the vice president of
sales and operations for TCI and Power Express, both companies
are two of several related companies owned by Konrad and his
family.  (See id. at 9:3-11:23, 22:5-12.)  Konrad testified that
in 2003, he and Fulton formed Power Express Transportation, LLC

("PET") to provide local delivery services to Power Express
clients. (Id. at 22:20-23:5; Def.'s Resp. in Opp'n at 2.) From
the time PET was formed until Fulton's death in 2008, Fulton's
primary duties with the Konrad companies remained overseeing the
warehouse operation of Power Express. (Konrad Dep. at 16:1-12,
20:14-17, 21:4-22:1.) Fulton also oversaw limited operations of
PET. (Id. at 23:19-24:7.)

        According to Konrad, one of the reasons that he and Fulton
formed PET was to provide benefits, including life insurance, to
the both of them. (Id. at 44:13-23; 57:4-14.) Shortly after
forming PET, PET purchased and paid premiums on a life insurance
policy for Konrad. (Id. at 44:4-9.) In or around October 2006,
Konrad and Fulton sought insurance on Fulton's life. (Id. at
25:4-26:21.) Konrad contacted Gary Dering, an insurance broker
who had worked with Konrad on prior occasions, to negotiate a
life insurance policy for Fulton. (Id.; see also Gary Dering
Dep. (D.E. 49-3), Ex. 2 at 8:21-9:18.) On October 31, 2006
MetLife Investors USA Insurance Company ("MetLife") issued a
term life insurance policy insuring the life of Fulton.
(MetLife Policy Contract No. 206232287 ("MetLife Policy") (D.E.
49-4), Ex. 3; Def.'s Resp. in Opp'n at 3.) The MetLife Policy
provided $500,000 in death benefits. (MetLife Policy, Ex. 3.)
The MetLife policy was issued at the "Standard Smoker" premium

3

rate, and the quarterly premium was $1,448.28 (id.), which PET
paid (Konrad Dep. at 28:4-7, 34:16-21).

In April 2008, Konrad testified that he contacted Dering to
inquire about replacing Fulton's MetLife Policy with a less
expensive, non-tobacco-rated policy.  (Id. at 38:21-39:14;
Dering Dep. at 8:21-9:9.)  On April 14, 2008 Dering met with
Fulton at Power Express's offices to fill out an application for
life insurance with Defendant West Coast Life.  (Dering Dep.
8:17-9:18.)  At this time, Fulton completed an application for a
$500,000 term policy from Defendant at a standard, non-tobacco
rate.  (West Coast Life Insurance Application ("Application"),
(D.E. 49-4), Ex. 4.)  Fulton designated Plaintiff as the
beneficiary of the policy.  (Id.; Am. Compl. ¶ 11.)  If
approved, the quarterly premium on the new policy would be
$511.00.  (Application, Ex. 4.)  Immediately after completing
the Application, Fulton signed a Conditional Receipt Agreement
that contained pre-conditions to coverage, and PET issued a
check, signed by Konrad, for the first quarterly premium.  (Am.
Compl. ¶ 14; Def.'s Resp. in Opp'n at 3-4.)

As part of the application process, Fulton submitted to
blood screening, a urinalysis, and a medical examination on
April 17, 2008.  (Am. Compl. ¶ 13.)  Defendant West Coast Life
received the results of Fulton's urinalysis on April 22, 2008,
which indicated that Fulton tested positive for cotinine, the

active ingredient in nicotine.  (Id. ¶ 14; September 9, 2008
Denial Letter (D.E. 49-4), Ex. 8.)  On May 16, 2008 Defendant
West Coast Life received notice that Fulton died after suffering
a myocardial infarction on May 15, 2008.  On June 2, 2008
Defendant West Coast Life received a Claimant's Statement from
Plaintiff seeking benefits on the policy Fulton applied for on
April 14, 2008.  (Claimant's Statement (D.E. 49-4), Ex. 13.)

     Throughout June, July, and August 2008, Defendant West
Coast Life conducted a claim investigation that ultimately
resulted in the denial of benefits.  The denial letter stated
that no coverage had been issued at the time Fulton died since
he applied for a non-tobacco policy and failed to meet its
requirements.  (September 9, 2008 Denial Letter, Ex. 8.)  In the
instant case, Plaintiff asserts causes of action against
Defendant for breach of contract; bad faith refusal to pay
pursuant to Tennessee Code Annotated § 56-7-105; unfair and
deceptive acts in violation of the Tennessee Consumer Protection
Act, Tennessee Code Annotated § 47-18-109; and negligence.  (Am.
Compl. at 12-13.)  Plaintiff's claims contest the circumstances
surrounding Fulton's life insurance application and Defendant's
denial of coverage.

     Plaintiff contends that by asserting ERISA as a basis for
the Court's jurisdiction, Defendant concedes that the life
insurance policy applied for on April 14, 2008 was valid and

enforceable at the time of Fulton's death.  (Pl.'s Mot. for
Partial Summ. J. at 4.)  In the alternative, Plaintiff argues
that if the Court accepts Defendant's position that it never
issued a life insurance policy, then the Court must remand the
case to state court because Plaintiff's claims would not be
completely pre-empted by an ERISA plan.  (Id. at 6.)  Defendant,
to the contrary, argues that subject matter jurisdiction and the
merits of Plaintiff's complaint are distinct issues and that
subject matter jurisdiction based on an ERISA plan does not
necessitate a ruling on the merits of Plaintiff's complaint at
this early stage.  (Def.'s Resp. in Opp'n at 11.)

## II.  Analysis

By statute "any civil action brought in a State court of
which the district courts of the United States have original
jurisdiction, may be removed by the defendant" to the federal
district court where such action is pending.  28 U.S.C. §
1441(a).  Removal statues are to be narrowly construed since
they implicate federalism concerns.  Long v. Bando Mfg. of Am.,
Inc., 201 F.3d 754, 757 (6th Cir. 2000).  As the party seeking
removal, Defendant has the burden of showing that the district
court has original jurisdiction.  Id.

District courts have original jurisdiction over civil
actions "arising under the Constitution, laws, or treaties of
the United States."  28 U.S.C. § 1331.  The presence or absence

6

of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is present on the face of the plaintiff's properly pleaded complaint. Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987).  There is an exception, however, to the well-pleaded complaint rule. "[W]hen a federal statute wholly displaces the state-law cause of action through complete pre-emption," the state claim can be removed because it "is in reality based on federal law." Aetna Health Inc. v. Davila, 542 U.S. 200, 207-08 (2004).  The Supreme Court has determined that ERISA is one of these statutes.  Id. at 208.

ERISA's integrated system of civil enforcement procedures enumerated in § 502(a), 29 U.S.C. § 1132(a), is "a distinct feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans." Aetna Health, 542 U.S. at 208. Therefore, any state-law claims within the scope of ERISA's civil enforcement provisions of § 502(a) are completely pre-empted and removable to federal court.  Id. at 209.

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides:

A civil action may be brought - (1) by a participant
or beneficiary -  . . . (B) to recover benefits due to
him under the terms of his plan, to enforce his rights
under the terms of the plan, or to clarify his rights
to future benefits under the terms of the plan.

Because Plaintiff's state-law claims seek to recover benefits she contends were wrongfully denied, these claims would be considered within the scope of § 502(a)(1)(B) and completely pre-empted by federal law if the policy is an ERISA plan. <u>See generally</u> <u>Thompson v. Am. Home Assurance Co.</u>, 95 F.3d 429, 434 (6th Cir. 1996) (<u>citing</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 56-57 (1987)).[1]  The main issue therefore is whether the Policy is part of an ERISA "employee welfare benefit" plan.

### a. Establishing an Employee Welfare Benefit Plan

Title I of ERISA defines an "employee welfare benefit plan" as:

> [A]ny plan, fund, or program which has heretofore or is hereafter established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) . . . benefits in the event of sickness, accident, disability, death or unemployment . . . .

ERISA § 3(1), 29 U.S.C. § 1002(1) (1997).  The Sixth Circuit has developed a three-step factual inquiry to determine whether a benefit plan satisfies the statutory definition set out in ERISA § 3(1), 29 U.S.C. § 1002(1).  <u>Thompson</u>, 95 F.3d at 434-35. First, the court must apply the "safe harbor" regulations; second, the court must determine if there was a "plan"; and

---

[1]    The parties do not dispute that Plaintiff qualifies as a beneficiary with standing to assert a claim for benefits wrongfully denied if the contested Policy constitutes an ERISA plan.

finally, the court must ask whether the employer "established or maintained" the plan.  Id.

### i. "Safe Harbor" Regulations

A court must first apply the Department of Labor's "safe harbor" regulations to determine if the plan is exempt from ERISA governance.  Id. at 434.  A benefit plan is exempt if it satisfies all four requirements of the "safe harbor" regulations which provide:

(1)  No contributions are made by an employer or an employee organization;

(2)  Participation in the program is completely voluntary for employees or members;

(3)  The sole functions of the employer . . . with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees and members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4)  The employer . . . receives no consideration . . . in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).  "A policy will be exempted under ERISA only if all four of the 'safe harbor' criteria are satisfied." Thompson, 95 F.3d at 435.  According to the Department of Labor, "'employer neutrality is the key to the rationale for not treating such a program . . . as an employee benefit plan . . . .'"  Id. at 436 (citing 40 Fed. Reg. 34,526 (Aug. 15, 1975)).

In this case, the "safe harbor" regulations do not apply because PET contributed to the Policy and took an active role in its establishment.  Konrad testified that one of the primary reasons he established PET along with Fulton was to provide employee benefits, including life insurance.  (Konrad Dep. at 44:14-22.)  Konrad, whom Fulton reported to regarding his duties for Power Express, TCI, and PET (id. at 22:2-4), contacted Dering, the insurance broker involved in the disputed Policy, and initiated negotiations for Fulton's life insurance policy, (id. at 25:20-26:13).  Konrad testified that PET paid the premiums on Fulton's MetLife Policy (id. at 28:4-7) and the first premium on the disputed West Coast Life Policy in April 2008 (id. at 41:14-20, 43:14-17).  Konrad stated that Fulton's income was not affected in any way by PET paying the West Coast Life premium, nor did Fulton contribute any personal funds to pay the Policy premium.  (See id. at 44:23-45:14.)  Based on these facts, the Court finds that PET, through Konrad's actions, played an active and meaningful role in the solicitation of the Policy, thereby compromising employer neutrality and the availability of the "safe harbor" exemption.

### ii. "Existence" of an ERISA Plan

The second step in the Court's factual inquiry is to determine if a "plan" exists by examining "whether from the surrounding circumstances a reasonable person could ascertain

10

the [1] intended benefits, [2] beneficiaries, [3] source of
financing, and [4] procedures for receiving benefits."
Thompson, 95 F.3d at 435 (internal citation and quotation marks
omitted); Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir.
1982) (en banc).  "The purported plan need not be formal or
written to qualify as an ERISA benefit plan, but rather, the
court must look to the 'surrounding circumstances' to see if the
four factors have been met."  Williams v. WCI Steel Co., 170
F.3d 598, 602-03 (6th Cir. 1999) (citing Dillingham, 688 F.3d at
1372-73).

     In this case, the Court finds that all four factors
indicate that an ERISA plan exists.  Konrad's uncontested
testimony states that one of the purposes of forming PET was to
provide benefits, include life insurance benefits to himself and
Fulton, (Konrad Dep. at 44:14-23), thereby establishing the
plan's intended benefits.  Plaintiff is identified as the plan's
beneficiary.  (See Application, Ex. 4.)  PET was the intended
source of financing for the plan; PET had paid the premiums on
Fulton's previous MetLife policy and had already issued a check
for the first premium on the West Coast Life Policy.  (Konrad
Dep. at 28:4-7, 34:16-21, 44:4-9; Application, Ex. 4.)  Finally,
it is undisputed that Defendant West Coast Life has established
procedures for receiving plan benefits, evidenced by Plaintiff's
submission of a claim for benefits under the Conditional Receipt

Agreement.  (See Claimant's Statement (D.E. 49-4), Ex. 13
(listing instructions for receiving benefits from West Coast
Life).)[2]

### iii. "Establishment or maintenance" of an ERISA plan

Finally, if the safe harbor regulations do not apply and
the facts establish that a plan "exists," a court must determine
whether the employer "established or maintained" the plan "with
the intent of providing benefits to its employees." Thompson,
95 F.3d at 435.  The record in this case indicates that PET was
formed, in part, to provide benefits, including life insurance,
to Konrad and Fulton.  (Konrad Dep. at 44:14-23.)  Konrad, on
behalf of PET, contacted Dering to meet with Fulton and
negotiate life insurance rates in 2006 and then again in 2008.
(Id. at 25:20-26:13.)  Furthermore, Konrad signed a check issued
by PET for the first premium on the West Coast Life Policy,
which was submitted as part of Fulton's Application.  (Id. at
41:10-42:15.)  Plaintiff does not assert any evidence to contest
these facts.  As a result, the Court finds that PET, through
Konrad's actions, established an ERISA plan with the intent that
it would provide life insurance benefits to Fulton.

---

[2]     See Scott v. Assurant Employee Benefits, No. 04-2714 Ml/V, 2005 WL
2436819, at *8 (W.D. Tenn. Sept. 30, 2005) (finding that the "procedure for
receiving benefits" factor was satisfied because the insurance policy
included a summary section describing how to file a claim and requirements
for proof of loss).

The undisputed facts demonstrate that the contested Policy qualifies as an "employee welfare benefit" plan governed by ERISA.  Because the Policy is an ERISA plan, Plaintiff's state-law claims relating to the alleged wrongful denial of benefits under the plan are pre-empted by federal law and provide the Court with original jurisdiction.  Establishing the existence of an ERISA plan for jurisdictional purposes, however, is separate and distinct from establishing an entitlement to benefits under the contested plan.  Whether the Conditional Receipt Agreement entitles Plaintiff to benefits extends beyond the Court's jurisdictional analysis and involves genuine issues of material fact, which are not appropriate for summary judgment at this time.

## III. Conclusion

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Partial Summary Judgment or, in the Alternative, to Remand to State Court.

SO ORDERED this 19th day of May, 2010.

/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE

13